Case 4:13-cv-00575   Document 73-7   Filed on 06/02/14 in TXSD   Page 1 of 4

EXHIBIT G

DANIEL P. CASWELL  30(b)(6), Confidential                    February 21, 2014
COOPER INDUSTRIES vs. CONTINENTAL CASUALTY                              45–48

Page 45

1    Q.    Is she still with CNA?
2    A.    The last I knew, she was still with
3  CNA.
4    Q.    And when I say "CNA," is she with
5  Resolute or is she at CNA?
6    A.    I believe -- the last I knew, she was
7  still at CNA, not with Resolute.
8    Q.    Do you know what the complex coverage
9  issues she is referring to are?
10    A.    I do have some understanding of the
11  coverage issues involved in this matter.  And
12  exactly what was in Ms. King's mind, I don't
13  remember at this point.
14    Q.    Well, this is 2008.  And apparently,
15  there were some coverage issues as opposed to
16  simply a question about the underlying claim
17  that's being asked here.
18        Let me ask a different question.  Do
19  you know to whom these copies were being sent?
20    A.    The progress note doesn't specifically
21  say.
22    MR. CAMERON:  Can we go off the record for
23  just a moment?
24    MR. GINSBERG:  Sure.

Page 46

1        (WHEREUPON, discussion was had
2        off the record.)
3    MR. CAMERON:  Back on the record.
4        Mr. Ginsberg, while we were off the
5  record, I pointed out to you it was my
6  understanding you have the privilege log.  And I
7  understand that there is some communications
8  between your office and mine about supplementing
9  it.  And that's the status of it right now.
10    MR. GINSBERG:  All right.  Thank you.
11  BY MR. GINSBERG:
12    Q.    Mr. Caswell, you talked earlier about
13  retrospective premiums, self-insured retentions,
14  et cetera, in the CNA program.  I want to explore
15  that for just a minute.
16        I received yesterday some documents
17  from Mr. Cameron's office, but let me just start
18  with a general question.  Is it your
19  understanding that the 1979 and 1980 policies
20  still have open retros?
21    A.    That is my understanding.
22    Q.    And that the retros, any retro
23  premiums for prior years are closed?
24    A.    That's not my understanding.

Page 47

1    Q.    Okay.  Tell me what your understanding
2  is because you mentioned you had a conversation
3  with Mr. Fogle where you talked about '79 and '80
4  policies.
5    A.    Right.  That was what Mr. Fogle was
6  mentioning, so his understanding was that '79 and
7  '80 were open.  There are a group of policies
8  that I believe go from '71 through '75 that have
9  retrospective premiums that have not been maxed
10  out.  And to the extent that there are claims and
11  payments sought under those policies, the
12  retrospective premiums would apply.
13    Q.    Okay.  What about the '75 to '79
14  policies?
15    A.    The '75 policy was a Fidelity &
16  Casualty policy.  And I'm not aware of any
17  retrospective premium on that, although there may
18  very well have been, given the nature of Cooper's
19  program.  I'm just not aware of it.
20        The policies between '76 and '79, my
21  understanding is that the retrospective premiums
22  have been maxed out on those policies, and
23  therefore, we no longer have retrospective
24  premiums that would apply to claims.

Page 48

1    Q.    How did you go about determining that
2  the '71 to '75 retro premiums were not maxed out?
3    A.    I talked to people in the
4  Retrospective Premium Department.
5    Q.    When did you do that?
6    A.    I don't remember exactly.  Sometime
7  within the last two years.
8    Q.    Who did you talk to?
9    A.    Dan Peterson.
10    Q.    And this is the Retrospective Premium
11  Department at CNA, or at Resolute?
12    A.    At CNA.
13    Q.    Dan Peterson is his name?
14    A.    Correct.
15    Q.    And where is he located?
16    A.    At CNA in Chicago.
17    Q.    What information did you receive from
18  Mr. Peterson?
19    A.    He told me that the retrospective
20  premiums from 1971 to 1975 had been closed for
21  administrative reasons, but there was no
22  indication that they were maxed out, and that the
23  Retrospective Premium Department's view of that
24  is that those are subject to reopening and



DANIEL P. CASWELL  30(b)(6), Confidential                February 21, 2014
COOPER INDUSTRIES vs. CONTINENTAL CASUALTY                69–72

Page 69

1      Can you tell from looking at Exhibit 1
2  whether the first page, this "New Asbestos Claims
3  Worksheet," relates to the claims that are below
4  it in this document?  I mean I'll represent that
5  this was the way we received them from CNA.  I'm
6  just trying to make sure that the first page, in
7  fact, relates to the subsequent pages.  And the
8  way I get there is because it refers to a claim
9  in Indiana on the first page and refers to --
10      A.   Well, it refers to the McClure law
11  firm.
12      Q.   Which shows up on the summons.
13      A.   Right.  Even though they don't show up
14  on some of the other documents.  It looks to me
15  like it could for those same reasons that you
16  just stated, but that's about it.  It doesn't
17  have any other specific designation.
18      Timing-wise, it would seem to
19  correspond as well, the February, 2007, time
20  period.
21      Q.   Well, what's interesting about this is
22  it doesn't -- this asbestos claims worksheet
23  doesn't identify the claimant, right?
24      A.   It doesn't list the claimant on it.

Page 70

1  And, of course, if it's accompanying documents
2  just like it's contained here, then you have it.
3      Q.   All right.  Okay.  I gotcha.  I just
4  wanted to -- in your view of this document, the
5  first page of Exhibit 1 relates to the following
6  documents?
7      A.   I can't tell for sure, but that seems
8  logical.  And if that's the way it was contained
9  in the file, I think that is logical.
10      Q.   It was the way it was produced to us.
11  I just want to --
12      A.   Okay.
13      Q.   All right.  Let me show you what we've
14  marked as Exhibit 5 now which is the Notice of
15  Deposition, 30(b)(6) deposition of CNA.
16      Have you had a chance to review this?
17      A.   I have.
18      Q.   Have you seen it before?
19      A.   I have.
20      Q.   And just to be clear for the record,
21  are you prepared to testify with respect to each
22  of these topics on behalf of CNA?
23      A.   I am.
24      Q.   Topic 4 says, "Defendants'

Page 71

1  investigation and evaluation of Cooper's claims
2  that are the subject of this litigation."
3      Do you know what investigation CNA did
4  of the underlying claims for which notice was
5  provided to CNA?
6      A.   The claims that are the subject of
7  this litigation, are you restricting that to only
8  the claims that Cooper has apparently put forth
9  in its complaint, or to the other related matters
10  that are contained or potentially referenced in
11  affirmative defenses and counterclaims?
12      Q.   For now, I'm only referencing Cooper's
13  claims for insurance coverage for the asbestos
14  claims against Cooper.
15      A.   Okay.
16      Q.   So I'm not talking about the
17  affirmative defenses or counterclaims.
18      A.   Okay.  My understanding of the Cooper
19  asbestos claims is that CNA has had some
20  conversations with Cooper over time, oftentimes
21  in conjunction with other Cooper matters that
22  were pending and more pressing, asking about the
23  underlying Cooper asbestos matters.  And I had
24  some of those conversations myself with Mr. Fogle

Page 72

1  more recently.  And he actually did provide some
2  spread sheet information, and I had some
3  follow-up questions that he actually hadn't
4  gotten back to me on before suit was filed.
5      Q.   So that was you that actually was
6  having these conversations?
7      A.   I had some of the conversations.
8  Others would have involved people like Dave
9  Steiger or Amy King.  Oftentimes, counsel was
10  involved in those because as I said, they tended
11  to arise in the context of other bigger matters
12  where we were talking about Pneumo Abex, or we
13  were talking about Cooper Cameron.
14      Q.   Did I ask you where Mr. Steiger is?
15  Is he still employed by CNA?
16      A.   The last time I talked to Mr. Steiger,
17  he was employed by CNA.
18      Q.   And that's not Resolute, but CNA
19  itself?
20      A.   CNA itself.
21      Q.   Do you know what his position is?
22      A.   Not by title.
23      Q.   Do you know what he does?
24      A.   He's involved in claims.  I think he's



DANIEL P. CASWELL  30(b)(6), Confidential
COOPER INDUSTRIES vs. CONTINENTAL CASUALTY

February 21, 2014
85–88

Page 85

1  emails?
2     A.   I do.
3     MR. GINSBERG:  We would ask for those to be
4  produced.
5     MR. CAMERON:  That's fine.
6  BY MR. GINSBERG:
7     Q.   Do you recall -- I guess the emails
8  would --
9     A.   They would give us some dates.  I can
10  give you a general time frame.  When was the
11  complaint filed?  Was it March of 2013?
12     Q.   March 4, 2013.
13     A.   Okay.  My recollection is we began
14  talking about the Cooper asbestos matters
15  sometime in the fall of 2012.  And we had a
16  couple of conversations with our last one being I
17  believe in February of 2013, with another
18  conversation scheduled for early March of 2013.
19  And before that next meeting or telephone meeting
20  took place, the complaint was filed.
21     Q.   Do you know how Mr. Fogle got to you
22  to talk about these issues?
23     A.   Yes.  I was talking to him about
24  Crouse-Hinds.

Page 86

1     Q.   And did he raise it, Cooper asbestos,
2  or did you raise Cooper asbestos?
3     A.   He raised it.
4     Q.   What did he say to you?
5     A.   He first raised it in the form of a
6  letter which he emailed to me, copied me on.  And
7  in that letter, he said something to the effect
8  that Cooper has been tendering claims.  We have
9  $3.2 million in defense.  We would like to talk
10  to you about CNA participating in this in some
11  way.  Those weren't the words he used, but that
12  was the content.
13     Q.   And did you respond to that letter?
14     A.   Yes.  We talked.
15     Q.   You had a phone call with him.  And
16  what did you say to him in the phone call?
17     A.   I don't remember specifically.
18     Q.   All right.  What did you say to him
19  generally?
20     A.   We had a number of phone calls.  And I
21  can give you the gist of sort of the progress.
22  And again, we had some emails where we exchanged
23  information.
24        And the basic concept was Mr. Fogle

Page 87

1  said that -- I mean having settled with Mount
2  McKinley and Gibraltar, and I think that was back
3  in 2009, my understanding, based on information
4  that I have seen in other Cooper accounts, is
5  that Gibraltar actually was on the hook for a
6  large share of Cooper's costs and were paying
7  75 percent or 100 percent of those costs up until
8  the time they did a buyout with Cooper.
9        So Gibraltar did a buyout settlement
10  with Cooper, paid money that was allocated to
11  Cooper, to Gardner Denver, to Crouse-Hinds, maybe
12  Cooper Cameron.
13        And then based on what Mr. Fogle told
14  me, I understood that he began talking to
15  Travelers.  And he had worked out a deal with
16  Travelers, in relation to the Cooper asbestos
17  matter, at which point he was now coming to talk
18  to CNA.
19        And so we talked about the coverage
20  picture.  We talked about retrospective
21  premiums.  We talked about allocation.  We talked
22  about the past cost claim and the proof that we
23  would need for that.  We talked about the other
24  settlements, other arrangements that they had and

Page 88

1  the information we'd need there.
2        And we had made some progress, just in
3  terms of understanding how the coverage block
4  worked and if you were apportioning it in a pro
5  rata way, how you would do that.
6        That was the discussion where
7  Mr. Fogle said, Well, let's not include the '79
8  to '81 period because of the retro issue, but
9  instead, look at the '71 to '78 period.  And here
10  is how I would factor that into a pro rata
11  allocation for CNA's share.  And he had a number
12  for that.
13     Q.   Do you remember what that number was?
14     A.   Not exactly, but it was in the 27, 28
15  percent range.
16     Q.   And was that a past costs number,
17  percentage of past costs and future costs?
18     A.   That was the contemplation I think
19  when he put that number out there.
20     Q.   And what was your response to that?
21     A.   The number itself was rational
22  mathematically, based on the coverage block,
23  excluding the '79 to '81 coverage.
24        However, I advised him that we also



Case 4:13-cv-00575   Document 73-7   Filed on 06/02/14 in TXSD   Page 4 of 4

DANIEL P. CASWELL  30(b)(6), Confidential                    February 21, 2014
COOPER INDUSTRIES vs. CONTINENTAL CASUALTY                            89–92

Page 89

1   had retros on the earlier policies from '71 to
2   '75 along with other things that I have
3   mentioned that I had asked for.  And that was the
4   call right before suit was filed.
5       Q.   Mr. Caswell, just from an insurance
6   standpoint, without regard to retrospective
7   premiums that may or may not be owing under the
8   policies, you would agree with me that that block
9   of policies, '71 to '81, would, in the ordinary
10  course, respond to asbestos claims alleging
11  occurrences during that period, right?
12      MR. CAMERON:  Object to the form of the
13  question.
14  BY THE WITNESS:
15      A.   The concept of insurance in that time
16  frame responding to asbestos claims is
17  reasonable, but this is not your normal insurance
18  program.
19  BY MR. GINSBERG:
20      Q.   But I said aside from -- and I
21  understand it's not normal because of the
22  retrospective or self-insurance programs is what
23  you're talking about, right?
24      A.   Right.  Multiple features that are

Page 90

1   self-insurance.
2       Q.   Right.  I understand that.  But
3   otherwise, if you look at the paper itself, this
4   isn't a fight about whether comprehensive general
5   liability policies respond to asbestos claims in
6   that time period.  It has been happening for
7   decades, right?
8       A.   It's not a fight about whether
9   comprehensive general liability policies might
10  have to respond to asbestos claims.  You know
11  that there are lots of qualifications on
12  something like that.  Obviously, if you're
13  looking at an individual claim and the date of
14  loss postdates the coverage, you don't respond,
15  things like that.
16          There are even some more extreme
17  situations, but I don't have facts to say those
18  extreme situations apply here about knowledge of
19  asbestos and, you know, those are potential
20  defenses, but I think we have raised as potential
21  affirmative defenses.  But in the general course,
22  that's not what this fight is about.
23      Q.   Okay.  I just want to get to that
24  point.  This is really a question -- to me, and

Page 91

1   I'm just trying to make sure we're on the same
2   page, in two ways, it's a question of whether
3   Cooper was asking for CNA to defend and that's by
4   sending the notice letters.  I think you said
5   that before, you didn't think it was clear that
6   Cooper was asking for defense.
7       THE WITNESS:  Could you read back that
8   question, please?
9   BY MR. GINSBERG:
10      Q.   It will probably be easier just to
11  rephrase.  I'm sorry.  Let me try it again.  I'm
12  just trying to get to the nut of the issue that
13  we have to deal with in this case.
14          And I understand really your position
15  to be that it was not clear to CNA that Cooper
16  was asking CNA to defend these lawsuits.
17      A.   That is correct.  And the nut of the
18  issue is something that I'm happy to get to.  In
19  settlement discussions with Mr. Fogle when we're
20  in litigation, we need to talk about all the
21  different things that can come into play.
22      Q.   And so I want to continue to talk to
23  you about all of the things that can come into
24  play.  And you have been, you know, very

Page 92

1   straightforward.  I'm asking if there are any and
2   if you have any information that supports these
3   defenses.  Let me go ahead and finish that
4   process just so we --
5       A.   Okay.
6       Q.   I think we just completed the
7   cooperation clause issue.
8           The next one, the tenth defense, is
9   really I think what we would call in the
10  vernacular, a late notice defense.  I think
11  you've told me that you don't really have any
12  information suggesting that Cooper's notice was
13  late for any of these claims?
14      A.   Well, I don't have specific knowledge
15  of a particular claim where notice was late.  And
16  we looked at one where I said that looks like it
17  was reasonably timely.
18          But I also don't have a complete list
19  of claims and a complete list of the notice dates
20  fleshed out in discovery to say did Cooper fail
21  to give notice of a claim at all, or did it give
22  notice after the plaintiff's deposition was
23  already taken because it was an exigent case.
24  Those are issues that could come into play on an

